IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SONIX TECHNOLOGY CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-cv-2082 |
| | ) | |
| PUBLICATIONS INTERNATIONAL, LTD., | ) | |
| SD-X INTERACTIVE, INC., | ) | |
| ENCYCLOPAEDIA BRITANNICA, INC., and | ) | |
| HERFF JONES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Sonix Technology Co, Ltd., ("Sonix") brings this patent infringement action against Defendants Publications International, Ltd. ("PIL"), SD-X Interactive, Inc. ("SD-X"), Encyclopaedia Britannica, Inc. ("Encyclopaedia Britannica"), and Herff Jones, Inc. ("Herff Jones"), (collectively, "Defendants"). Defendants now move for leave to amend their final non-infringement and invalidity contentions. (R.153.) For the reasons discussed below, the Court grants Defendant's motion in part.

### BACKGROUND

U.S. Patent No. 7,328,845 ("the '845 Patent") describes a method for producing visually negligible dot patterns – referred to as "graphical indicators" – affixed to a surface (e.g., the page of a book), that overlap and co-exist, but do not interfere, with the main information on the surface of the object (e.g., visual text and images). (R.91-1, '845 Patent, at JA19, col.2:55 – JA20, col.3:3.) The dot pattern technology is a centerpiece of this patent infringement action. Before the Court is Defendants' Motion for Leave to Amend their Final Non-Infringement and

Invalidity Contentions in Light of New Evidence pursuant to Local Patent Rule 3.4 and Federal Rule of Civil Procedure 26(e). (*See* R.152.) Specifically, Defendants contend that Dr. Amit Ashok, Sonix's liability expert, disclosed new information during his deposition on July 15, 2015 that clarified Sonix's position on two issues: one relating to the meaning of a key claim term describing the dot pattern as "visually negligible", and the other relating to a component of the dot pattern referred to as "header information". (*Id.*) Defendants assert that these clarifications have greatly affected the defenses available to them during this litigation, including at the current stage of summary judgment. (*Id.*) Before turning to the merits of Defendants' motion, a review of the discovery process that has occurred—and not occurred—in this case provides a helpful context.

**I.     Pleadings**

On March 18, 2013, Sonix filed its Complaint against PIL and SD-X, alleging infringement of one or more claims of the '845 Patent. (R.1, Compl., ¶¶ 14-18.) On September 17, 2013, Sonix filed its First Amended Complaint naming two additional Defendants, Encyclopaedia Britannica and Herff Jones, alleging that Defendants infringed one or more claims of the '845 Patent in violation of 35 U.S.C. §271(a). (R.49, First Am. Compl., ¶¶ 16-20.) In addition, Sonix alleged that Defendants PIL and SD-X infringed one or more claims of the '845 Patent in violation of 35 U.S.C. §271(b). (*Id.*, ¶¶ 21-29.) Sonix also alleged that Defendant PIL was liable as the alter-ego of SD-X for the damages suffered by Sonix. (*Id.*, ¶¶ 30-34.) On October 11, 2013, Defendants filed their Answer, Counterclaims and Affirmative Defenses to Sonix's Complaint. (R.57, PIL's Answer; R.58, SD-X's Answer; R.59, Encyclopaedia Britannica's Answer; R.60, Herff Jones' Answer.)

## II. Initial Contentions & Interrogatories

Sonix served its Initial Infringement Contentions on November 11, 2013. Defendants served their Initial Noninfringement Contentions on November 23, 2013 which stated "[o]thers of the products identified by [Sonix's Initial Infringement Contentions] incorporate the technology … patented by U.S. Patent No. 7,770,805 issued to General[P]lus Technology Inc. ["GeneralPlus"]. Defendants import, sell, and offer for sale those products pursuant to a license from [GeneralPlus]." (R.153-2, Defs.' Initial Noninfringement Contentions, Ex. 2, at 4.) GeneralPlus is a Taiwanese corporation and direct competitor of Sonix. (Defs.' Mot. Hrg. Tr., 10:1-19, Aug. 5, 2015; R.158-19, Decl. of Ben Wang of GeneralPlus ("Wang Decl."), ¶¶ 2, 4.) Plaintiff issued interrogatories related to the Accused Products and sought identification from some of the Defendants as to "all Your Products which You contend You imported, sold, or offered for sale in the United States pursuant to a license from … 'General[P]lus'." (*See e.g.,* R.153-3, Def. PLI's Resp. to Pls.' First Set of Interrogs. (Nos. 1-16), at 7; R.153-4, Def. SD-X's Resp. to Pls.' First Set of Interrogs. (Nos. 1-16), at 7.) Defendant PIL objected to the interrogatory "as requiring a breach by PIL of an obligation to a third-party to maintain such information as confidential" and identified a group of pen and book sets, including "MIPP", "MY POINGO", and "BRITANNICA" pen and book sets. (R.153-3, Ex. 3, at 8-11.)

Defendants responded to subsequent interrogatories inquiring about license agreements with GeneralPlus and directed Sonix to a "license between SDX and [GeneralPlus] entitled 'License and Supply Agreement' and having an effective date of March 1, 2010." (R.153-3, at 11.) Sonix also issued an interrogatory requesting the identification of "the person (or persons) most knowledgeable about how Your Products operate to output the desired information from a captured dot pattern image, including a detailed description of how Your Products associate the

3

captured dot pattern image with a particular audio file for output to the user." (*Id.*, at 19.) Defendant PIL objected to the information "as seeking privileged information, including information which was developed for or in anticipation of litigation, or which reflects the work product of counsel or confidential attorney-client communication." (*Id.*) Defendant PIL responded that "the persons most knowledgeable to the topics identified in this Interrogatory are employed by GeneralPlus." (*Id.*, at 20.) Defendant PIL further indicated that it "does not manufacture the accused products, or have any input into the technology, including the SDX pen reader and the dot pattern images/technology, and so, it cannot it [sic] provide any additional information to this Interrogatory." (*Id.*) In response to the same interrogatories, Defendant SD-X objected to the interrogatories as requiring a breach "of an obligation to a third-party to maintain such information as confidential." (R.153-4, at 7-8, 17.) Sonix assumed that Defendants' representation meant they did not have custody and control over GeneralPlus or its documents. (*See* Defs.' Mot. Hrg. Tr., 39:4-25.)

Despite receiving notice from Defendants regarding their relationship with GeneralPlus, Sonix never issued (i) a records subpoena seeking information from GeneralPlus, or (ii) a deposition subpoena to obtain testimony from GeneralPlus representatives regarding the products at issue. (R.152, Defs.' Mot. To Amend Final Contentions, at 3; *see also* R.153-1, Pang. Dep., 115:9-116:21, Apr. 14, 2015 (testifying that Sonix did not ask for access to GeneralPlus' source code nor did they investigate GeneralPlus' patent portfolio regarding dot-based technology); *id.*, 118:17-119:10 (testifying that Sonix never decompiled GeneralPlus' software nor did it view any pseudo-code or algorithms associated with GeneralPlus' dot pattern system); *see also* Wang Decl., ¶ 10 ("no one from Sonix approached GeneralPlus to ask about GeneralPlus' proprietary dot pattern, including to ask whether it was covered by GeneralPlus' patent. Nor has Sonix's

4

expert, approached anyone at GeneralPlus to inquire regarding what dot pattern technology might be used in [PIL's] products, or how that dot pattern technology encodes information, and is read, recognized, and decoded").) Sonix also did not attempt to obtain any evidence from GeneralPlus through any international agreements. (*Id.* at 10:4-10.) Indeed, Sonix admits that it made no efforts, at any time during this case, to pursue discovery directly from GeneralPlus. (Defs.' Mot. Hrg. Tr., 6:5-8 ([Sonix's Counsel]: "there was no discovery obtained from GeneralPlus by plaintiff in this case, nor do we believe that we could have obtained the discovery because GeneralPlus is likely out of the court's subpoena power"); *id.*, 10:1-19 ("The Court: But you didn't do anything independent given that they were outside of the subpoena power, in a foreign country and direct competitors?" [Sonix's Counsel]: That's correct, your Honor").)

The Court held a *Markman* hearing on September 11, 2014. On October 6, 2014, Defendants sent a letter to Sonix asserting that its initial responses to invalidity contentions were insufficient and asking Sonix to supplement them. (*See* R.153-9, Ex. 11, Oct.6, 2014 J.Koering Letter to S.Fallon.) Sonix responded that it was under "no obligation to further supplement its Response to Defendants' Initial Invalidity Contentions when the Court's claim construction is imminent, and will be followed in 60 days by Defendants' final invalidity contentions." (*See* R.153-10, Ex. 12, Oct.9, 2014 S.Fallon Letter to J.Koering.) On October 30, 2014, the Court issued its claim construction ruling. (R.123.) Defendants maintained their position that Sonix's contentions were insufficient after the parties met and conferred on November 1, 2014, at which point Sonix indicated that its contentions were complete. (R.153-10, Ex. 15, Nov. 3, 2014 J.Koering Email to S.Fallon.) According to Defendants, Sonix's final contentions were essentially the same as their initial contentions. (Defs.' Mot. Hrg. Tr., 26:1-9; R.168, at 4-5.)

On January 27, 2015, Defendants amended their Rule 26 Disclosures to include "[o]ne or more individuals at GeneralPlus" to testify on the topic of "knowledge concerning the function and operation of PIL and SD-X electronic products, including certain POINGO products and dot patterns used in associated books."[1] (*See* R.153-6, Ex. 8, PIL and SD-X's Am. Fed. R. Civ. P. 26(a)(1)(A)(i) Initial Disclosures.) Defendants served their final invalidity contentions on January 28, 2015, reserving the right to amend their contentions if new information arose. (*See* R.153-11, Ex. 16, Defs.' Final Invalidity Contentions Pursuant to LPR 3.1, at 2.) On that same day, Defendants issued interrogatories requesting the factual basis for Sonix's claims. (*See* R.153-12, Ex. 17, Defs.' Second Set of Interrogs.) Although fact discovery had closed on March 2, 2015 (R.129), Sonix responded to the interrogatories on March 20, 2015. (R.153-13, Ex. 18, Sonix's Resp. to Defs.' Second Set of Interrogs.) According to Defendants, "Sonix obfuscated and pushed all inquiries regarding the functionality of the products to their experts." (R.153, at 7.) Sonix responded that many of the requests were "outside the knowledge of Sonix"; "premature"; and pertained to "information within the knowledge of Sonix's testifying expert, which are matters properly reserved for expert discovery". (R.153, at 13; *see also* R.153-13 (Sonix's Response to Defs.' Interrog. Nos. 1, 2, 4-7, 9, 10, 11, and 12).)

On April 14, 2015, Defendants sought clarification of Sonix's positions from its Rule 30(b)(6) corporate representative deposition, Ching Fung Pang. (R.153-14, Ex. 19, Am. Notice of Dep. Pursuant to Rule 30(b)(6).) One of the designated topics for Mr. Pang's testimony was "Sonix's claims of infringement." (*Id.*, at 4.) According to Mr. Pang, Sonix first became concerned with possible infringement by Defendants around 2007 or 2008. (R.153-1, Pang Dep., at 9:23-10:11, 46:13-49:17.) Sonix also became aware of GeneralPlus, a company Sonix thought

---

[1] Although fact discovery was still open at this time, Sonix continued to ignore the opportunity to pursue discovery from GeneralPlus or inquire with Defendants as to the identify of the witness(es).

to have a competing dot pattern technology, at that time. (*Id.*, 47:15-48:21.) In 2010, Sonix learned that Defendant PIL was considering using GeneralPlus as a vendor. (*Id.*, 50:14-50:22.) Sonix first communicated its concerns about infringement to Defendants in 2012. (*Id.*, 50:23-51:6.) When Defendants asked Mr. Pang about Sonix's infringement contentions and what information Sonix possessed to support its position that the accused products performed certain functions, Sonix's counsel consistently objected, stating: "Mr. Pang is not being offered as a technical expert in this case. He's also not familiar with the patent terminology or the court's construction of these terms in this case. You can inquire based on Mr. Pang's personal knowledge, but I'm instructing him not to disclose information he's learned from communications with counsel." (*Id.*, 111:1-17; *see also id.*, 99:15-100:2; 104:16-17; 107:5-9; 113:9-10.)

### III.     Expert Discovery and Dr. Ashok's Alleged New Information

On May 5, 2015, Sonix served the expert report of Dr. Amit Ashok, its liability expert. (R.153-15, Ex. 20, Pl. Sonix's Op. Expert Report of Infringement of Amit Ashok.) After reaching an impasse with Sonix regarding Defendants' request that Sonix produce Dr. Ashok for a deposition to provide specificity about his positions prior to issuing rebuttal reports, Defendants filed a motion to compel expert depositions and to modify the schedule. (*See* R.140; R.141.) The Court denied Defendants' motion because they failed to show good cause to warrant a modification of the expert discovery schedule for rebuttal reports and expert depositions just ten days before the rebuttal reports were due. (*See* R.146.) The Court noted, however, that "Defendants are free to address the issues raised regarding Plaintiff's expert through a *Daubert* challenge or any other permissible means." (*Id.*)

On July 15, 2015, Defendants deposed Sonix's liability expert, Dr. Ashok. (R.153-7, Ex. 9, Ashok Dep., July 15, 2015.) Defendants claim that Dr. Ashok clarified Sonix's position on the two issues that are the subject of their requested amendments. Defendants assert that Sonix, throughout the litigation, has taken the position that its experts would address the issues of (i) functionality of the technology covered by the '845 patent, and (ii) the meaning of the patent's claim terms. (R.153, at 11.) Specifically, Defendants contend that the new information Dr. Ashok presented during his deposition impacts both their non-infringement and invalidity arguments.

First, with respect to non-infringement, Defendants argue that Dr. Ashok presented a new position when he testified that a dot pattern system that does not determine the boundary of a graphical indicator does not then satisfy the "header information" claim limitation because it does not "distinguish one graphical indicator from an adjacent graphical indicator." (R.153-7, Ashok Dep., 220:2-25.) Claims 9, 25, 35, 46, 52-53, 71-73, and 90 of the '845 Patent include the term "header information" which the Court construed to mean "information in the graphical indicator that is used to retrieve the graphical indicator and corresponding content information and is capable of (1) distinguishing the corresponding graphical indicator from an adjacent graphical indicator, and (2) indicating the orientation of the corresponding graphical indicator to the optical device." (*See* R.123, at 54, 68.) Dr. Ashok's position linking the "distinguishing" capability of "header information" to the boundary of the graphical indicator, is one that, according to Defendants, is a new position that GeneralPlus can directly rebut as applicable to the accused infringing products. (R.153, at 5.) Accordingly, Defendants request to supplement their final non-infringement contentions to state that the accused products do not infringe any of the asserted claims because they do not determine the boundary of the graphical indicator.

Second, with respect to invalidity, Defendants contend that only at Dr. Ashok's deposition did they obtain enough information to appreciate that Dr. Ashok's arguments rely on a distinction between the patent claims and the prior art, specifically regarding the "visually negligible" claim term. (Defs.' Mot. Hrg. Tr., 13:7-12.) Defendants argue that Dr. Ashok's testimony indicated that the claim term "visually negligible" is subjective in nature and lacks any objective test to determine its scope. (R.153-7, Ashok Dep., 49:12-51:11.) Defendants further assert that their expert, Dr. Engels, agrees. (*See* R.153-8, Ex. 10, Engels Dep., 15:12-16:7.) According to Defendants, the first time that Sonix disclosed its understanding of the "visually negligible" term—beyond asserting it had its ordinary meaning during claim construction—was during Dr. Ashok's deposition. Defendants, therefore, argue that because Sonix first disclosed its understanding of the "visually negligible" claim term during expert depositions, Defendants have established good cause to supplement their final invalidity contentions with this new information.

## LEGAL STANDARD

Local Patent Rule 3.4 provides that a party may amend its final contentions only by order of court "upon a showing of good cause and absence of unfair prejudice to opposing parties made promptly upon discovery of the basis for the amendment." L.P.R. 3.4; *see also Sloan Valve Co., v. Zurn Indus., Inc.*, No. 1:10-cv-00204, 2012 WL 6214608, at *2 (N.D. Ill. Dec. 13, 2012) (citations omitted). The purpose of the local patents rules is to "prevent a 'shifting sands' approach to claim construction by forcing the parties to crystallize their theories of the case early in litigation.'" *Sloan*, 2012 WL 6214608, at *2 (citations omitted). Specifically, "[t]he purpose of infringement contentions is to provide notice of the plaintiff's theories of infringement early in the case because, in practice, it is difficult to obtain such information through traditional

discovery means, such as interrogatories.  *Id.*  Indeed, the early disclosure process demanded by Local Patent Rule 2.1, that supplements the requirements of Federal Rule of Civil Procedure 26(a)(1), "require[s] parties to identify the likely issues in the case, to enable them to focus and narrow their discovery requests."  Judge Matthew F. Kennelly and Edward D. Manzo, *Northern District of Illinois Adopts Local Patent Rules*, 9 J. MARSHALL REV. INTELL. PROP. L. 202, 207 (2009).  "To accomplish this purpose, the parties' disclosures must be meaningful—as opposed to boilerplate—and non-evasive."  *Id.*, at 207-08.

## ANALYSIS

Defendants have established "good cause" for leave to amend their final non-infringement and invalidity contentions.

### I. New Non-infringement Argument for "Header Information"

Dr. Ashok's clarification, provided during his deposition, that a dot pattern system that does not determine the boundary of a graphical indicator does not satisfy the claim limitation to "distinguish one graphical indicator from an adjacent graphical indicator" provided Defendants for the first time with a fundamental understanding of Sonix's position as to the "header information" claim term and the accused products.  Prior to hearing this testimony, Defendants were not aware that Sonix's expert equated "header information" and distinguishing between graphical indicators to a determination of a boundary for the graphical indicator.  Indeed, neither party proposed such an interpretation during claim construction.  (*See e.g.,* R.119; R.123.)

Sonix objects to the fact that Defendants did not receive notice of Dr. Ashok's position until his deposition citing to specific portions of the table in Attachment A of Sonix's initial infringement contentions.  (*See* R.164, at 13-14; R.164-4, Ex. D., Sonix's Local Patent Rule 2.2 Initial Infringement Contentions Re: Defs. PIL and SD-X.)  The portions of the table to which

Sonix refers, however, make no reference to a "boundary" determination associated with the "header information" claim element. Instead, the language merely echoes the language of the claim element as used in the claims. (*See e.g.,* R.164-4, Ex. D., at 2 ("The header information allows the Reading System to distinguish one graphical indicator from its adjacent graphical indicators and determine their proper orientations relative to the optical device"); *see also id.*, at 4, 6, 8. In Sonix's final contentions, the reference to a "graphical indicator boundary" is shown in Figure 3 as an "exemplary image of a dot pattern taken from the book used in this infringement analysis", but there is no connection made to this boundary identification and the claim element of "header information". (R.164-5, Ex. E, Pl. Sonix's Final Infringement Contentions Re: Defs. PIL and SD-X, at 18.)

Sonix's assertion that Dr. Ashok's expert report provided notice on May 5, 2015 fares no better. Although Dr. Ashok at the time addressed "boundaries" in the context of "header information", he did so acknowledging that the accused products "do not rely on any external markings for boundary determination …" and proceeded to assert that the "header information" limitation of the claims was met by introduction of a "specific fixed pattern of dots embedded within each graphical indicator" in Defendants' products. (*See* R.153-15, at 25-26; R.168, at 11-12.) This position differs from that taken in Dr. Ashok's deposition where he elaborates on what his understanding of the functional capability of "distinguishing" means, stating: "distinguish means determining boundary". (*See* R.153-7, Ashok Dep., 220:4-25; R.168, at 11-12.) Dr. Ashok's testimony during his deposition of what functional capabilities are required to "distinguish" between graphical indicators clarified his position to a point where Defendants felt that testimony from GeneralPlus would provide them with a new basis for a non-infringement defense. As such, Defendants now rely on the Wang Declaration from GeneralPlus' algorithm

11

engineer, Ben Wang, presented for the first time in support of their summary judgment motion. (*See* R.158-19, Wang Decl., July 24, 2015.)

The timing and method used to present this argument, however, are problematic. Although Sonix has been on notice of GeneralPlus since at least 2010 and at the latest by 2013, and has chosen not to pursue discovery from it, Defendants have maintained throughout this litigation that GeneralPlus' information was unavailable to them and that they could not disclose it due to breach of confidentiality concerns. (*See* R.153-3, Def. PIL's Responses to Pls.' First Set of Interrogs. (Nos. 1-16), at 8.) Upon arrival of the dispositive motion deadline, however, Defendants now seem to have had access to and are heavily relying on information from a GeneralPlus algorithm engineer, something Sonix assumed Defendants could not do based on Defendants' repeated representations. (Defs. Mot. Hrg. Tr., 39:16-25.) Prior to this declaration, both parties took the same position, that "the status of this issue throughout the litigation [is that] neither party knows how the accused device operates; only GeneralPlus knows how the device operates and GeneralPlus' information is not within the defendants' custody or control." (*Id.*, 9:19-23; *see also* R.156, at 1 ("None of the parties to this case have direct, specific knowledge regarding how the accused products read, recognize, and decode dot patterns that are allegedly the subject of the patent in-suit"). Given the late disclosure of GeneralPlus' knowledge relating to the functionality and operation of the accused products, fairness demands that both parties have at least a limited opportunity to explore that information. Mr. Wang's declaration states "the method used to decode the dot patterns using GeneralPlus technology is not disclosed publicly, including the method used to recognize and decode dot patterns printed immediately next to other dot code patterns on a page. This is information that you cannot tell just by looking

at the dot patterns, as there are a number of different ways that process may be accomplished."
(R.158-19, ¶ 9.)

Without an opportunity to depose Mr. Wang or to analyze any documents he has reviewed or considered that support his declaration, Sonix would suffer prejudice. Accordingly, the Court grants Defendants' request to amend their non-infringement contentions conditioned upon Defendants producing Mr. Wang for a deposition by September 9, 2015. In addition, Defendants are ordered to produce any discoverable materials Dr. Wang considered in rendering his declaration at least five days prior to his deposition. If Mr. Wang does not sit for a deposition, the Court will not consider his declaration in connection with Defendants' motion for summary judgment and will not permit Defendants to amend this aspect of their fon-infringement contentions.

## II.   New Invalidity Argument for "Visually Negligible"

Similarly, Dr. Ashok's clarification of "visually negligible" and his testimony regarding the ability to determine whether the dot patterns of the prior art are "visually negligible" sheds light on Sonix's understanding of a claim term that the parties originally agreed would be given its "ordinary meaning". (*See* R.119.) Although an expert's understanding of a claim term is not the sole, or even the primary, basis for that term's meaning or construction, the ability to differentiate between the claimed invention and the prior art is relevant to the Court's understanding of a claim term and consideration of the expert's testimony. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308-09 (Fed. Cir. 1999) (explaining the difference between a court's reliance on expert testimony to understand the technology versus to construct the claim term, the latter only being appropriate where "the patent documents, taken as a whole are insufficient to enable the court to construe disputed claim terms"); *see also Cordis Corp. v.*

13

*Boston Scientific Corp.*, 658 F.3d 1347, 1357-58 (Fed. Cir. 2011) (*citing Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.,* 292 F.3d 1363, 1375 (Fed.Cir. 2002)) (finding no evidence that a limitation was satisfied after noting that contrary testimony was based on an incorrect interpretation of a claim term).

Indeed, Sonix asserts that the dispute is not about the meaning of "visually negligible" in the claims, but rather about the scope and content of the prior art. (*See* Defs.' Mot. Hrg. Tr., 22:5-23:3.) The issues are not so distinct, however, as the scope and content of the prior art depends in part on how the person of ordinary skill understands "visually negligible", and how that term is then applied to the prior art. Dr. Ashok addressed his understanding of "visually negligible" during his deposition in response to inquiry by Defendants:

> Q. [Defs.' Counsel] Does the term "visually negligible" – does it have – what does that mean to you?
>
> A. [Dr. Ashok] So based on the different dot patterns I have examined during this case and the previous dot patterns I've come across in my previous experience, basically I understand visually negligible to mean that if these dot patterns are imprinted on a surface, with a cursory look, I will not notice that. Of course, if I look carefully, and depending on the visual acuity, you could probably notice it if you look carefully or magnify that dot pattern. But if these were printed on a page with appropriate magnification, I may not be able to identify them visually correctly on first look.

(R.168, at 7-8; R.153-7, Ashok Dep., 46:25-47:13; *see also* Defs.' Mot. Hrg. Tr., 18:8-15.) To the extent that Sonix relies on Dr. Ashok's understanding of "visually negligible" to differentiate the claimed invention from the prior art, Defendants have a right to respond to such an argument. This response includes questioning Dr. Ashok's understanding of the claim term and how that understanding informs his opinion about the scope and content of the prior art. Here, Defendants argue that if Dr. Ashok's understanding of the "visually negligible" claim term is accurate, then the term is invalid for indefiniteness. Because Dr. Ashok's opinion and understanding of the

"visually negligible" term was not elucidated until his deposition, Defendants' response is timely and they have shown "good cause" for leave to amend their invalidity contentions in this manner.

## CONCLUSION

For the reasons set forth above, the Court grants in part Defendants' motion to amend their Non-infringement and Invalidity Contentions to address Sonix's newly presented position on infringement specific to distinguishing graphical indicators and Sonix's expert's understanding of "visually negligible". The Court grants Defendants' motion conditioned in part on the production of Mr. Wang for a deposition and the production of all discoverable materials relied on by Mr. Wang in connection with his declaration submitted in support of Defendants' motion for summary judgment, that have not already been produced, five days prior to the deposition. The scope of Mr. Wang's deposition is limited to the materials addressed in his declaration filed by Defendants in support of their motion for summary judgment.

**DATED:  August 10, 2015**                                ENTERED

_____
AMY J. ST. EVE
United States District Court Judge