**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SONIX TECHNOLOGY CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13 C 2082 |
| | ) | |
| PUBLICATIONS INTERNATIONAL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Defendants Publications International, Ltd. ("PIL"), SD-X Interactive, Inc. ("SD-X"), Encyclopaedia Britannica, Inc. ("Britannica"), and Herff Jones, Inc. ("Herff Jones") have moved to bar the testimony of Plaintiff Sonix Technology Co.'s ("Sonix") damages expert Dr. Patrick Kennedy pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the following reasons, the Court, in its discretion, grants in part without prejudice and denies in part Defendants' motion. Plaintiff must file Dr. Kennedy's supplemental report explaining the hypothetical negotiation date he is using and the basis for his conclusion that regardless of which hypothetical negotiation date is used, namely, October 2009 or March 2010, his reasonable royalty analysis would remain the same. Dr. Kennedy's supplemental report is due before November 18, 2017. Defendants' supplemental rebuttal report, limited to this issue, is due before December 1, 2017.

**PROCEDURAL BACKGROUND**

On March 8, 2013, PIL and SD-X filed a lawsuit seeking declaratory judgment of non-infringement and invalidity of United States Patent No. 7,328,845 ("the '845 patent"), against

Sonix, the owner of the '845 patent. On March 18, 2013, Sonix, a Taiwanese company that designs and develops integrated circuits and related products, filed the present lawsuit involving the same occurrence. Rather than pursue service of a Taiwanese defendant, PIL and SD-X moved to voluntarily dismiss their action, which the district court granted on May 9, 2013. PIL and SD-X filed an answer in the present lawsuit on April 25, 2013. On September 17, 2013, Sonix filed a First Amended Complaint adding Herff Jones and Britannica as named Defendants.

The '845 patent, entitled "Method for Producing Indicators and Processing Apparatus and System Utilizing the Indicators," issued on February 12, 2008 and is directed to the use of graphical indicators (e.g., a matrix of small dots) affixed to the surface of an object and negligible to the human eye that provide information, beyond the visual text and images on the object's surface, that is retrievable through an electronic system. The '845 patent describes a method for producing visually negligible dot patterns – referred to as "graphical indicators" – affixed to a surface (e.g., the page of a book), that overlap and co-exist, but do not interfere, with the main information on the surface of the object (e.g., visual text and images). By the time Sonix filed this lawsuit in March 2013, the '845 patent had undergone two ex parte reexaminations before the United States Patent and Trademark Office ("PTO") – both resulting in the issuance of Ex Parte Reexamination Certificates on December 27, 2011 and December 26, 2012. The '845 patent was also subject to litigation that the parties settled and voluntarily dismissed in June 2011. *See Sonix Tech. Co., Ltd. v. VTech Elecs. N. Am., LLC*, 10 C 8291 (N.D. Ill. June 25, 2011).

In July 2015, Defendants filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) arguing that the '845 patent was invalid and non-infringed. In December 2015, the Court granted Defendants' summary judgment motion on the ground that

the '845 patent was invalid for indefiniteness.  Specifically, the Court concluded that the claim term "visually negligible" was subjective, that the claim language did not provide guidance on its meaning, and that the written description did not provide a person of ordinary skill in the art "with a meaning that is reasonably certain and defines objective boundaries as to the scope of 'visually negligible' as used in the '845 Patent.

In early 2016, Sonix appealed to the United States Court of Appeals for the Federal Circuit.  The Federal Circuit reversed the determination of indefiniteness and the judgment of invalidity on the ground that the term "visually negligible" was not indefinite.  The Federal Circuit specifically concluded that the claim term "visually negligible" was not purely subjective because "the question of whether something is 'visually negligible' or whether it interferes with a user's perception…involves what can be seen by the normal human eye." *Sonix Tech. Co., Ltd v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017).  Further, the Federal Circuit concluded that although "visually negligible" is "a term of degree," what "can be seen by the normal human eye" is an "objective baseline through which to interpret the claims." *Id.*  In sum, the Federal Circuit held "that 'visually negligible' is not a purely subjective term and that, on this record, the written description and prosecution history provide sufficient support to inform with reasonable certainty those skilled in the art of the scope of the invention." *Id*. at 1381.  The parties are now proceeding to trial.

**DEFENDANTS' DAUBERT MOTION**

Sonix has submitted Dr. Patrick Kennedy as its expert on damages.  As discussed in detail below, Dr. Kennedy's May 5, 2015 expert report details his damages opinion based on the hypothetical negotiation approach to calculating reasonable royalty damages.  *See, e.g., Prism Techs. LLC v. Sprint Spectrum L.P.,* 849 F.3d 1360, 1375 (Fed. Cir. 2017).  Defendants have

3

submitted Mr. David J Harkavy, who has a Masters Degree in Finance and is a Director at the Claro Group, as their expert rebuttal witness regarding damages. In the present *Daubert* motion, Defendants challenge Dr. Kennedy's expert opinions arguing that he did not calculate a hypothetical negotiation date, but instead assumed that the negotiation took place at some point in 2010, and that based on this foundational issue, the remainder of his analysis is invalid. Defendants also argue that Dr. Kennedy did not calculate a separate hypothetical negotiation date for each Defendant.

## DR. KENNEDY'S QUALIFICATIONS

Turning to Dr. Kennedy's qualifications, in 1986, he graduated summa cum laude from the University of California, San Diego with a B.A. in Economics. During his time at the University of California, San Diego, Dr. Kennedy received the Seymour E. Harris Economic Award for being the top economics student at the university. Dr. Kennedy continued to graduate school, and, in 1992, he graduated from Stanford University with a Ph.D. in Economics. While working on his Ph.D., Dr. Kennedy was a teaching assistant for a macroeconomics course and a lecturer in financial economics.

From 1992 to 1995, Dr. Kennedy was an Economist for the Board of Governors of the Federal Reserve System in Washington, D.C. In 1995, Dr. Kennedy became the Director of Economic Research for International Securities Group, Inc. From 1996 to 2006, Dr. Kennedy worked for BMB Mack Barclay, Inc. ("Mack Barclay"), an expert services firm, where he became a shareholder in 1998. After the global expert services and consulting firm LEGG acquired Mack Barclay, Dr. Kennedy began working for LECG, where he became Managing Director in 2008. Presently, Dr. Kennedy is the Managing Director for Torrey Partners, an economic, forensic accounting, and valuation services firm headquartered in San Diego. As the

Managing Director of Torrey Partners, Dr. Kennedy provides analysis, consultation, and opinions in business and dispute contexts, including discovery assistance, causation analysis, feasibility analysis, damage quantification, and testimony in federal and state courts.

Additionally, Dr. Kennedy holds numerous licenses and professional memberships. He belongs to the American Economic Association, the National Association for Business Economics, the National Association for Forensic Economics, and the Licensing Executive Society. Dr. Kennedy is also an Economic Leadership Board Member for the University of California, San Diego. Furthermore, he has served as an expert witness in numerous patent and intellectual property cases. *See, e.g.*, *Immersion Corp. v. Samsung Electronics, Ltd.* (2:17-cv-0572, E.D. Tex.); *Innovative Display Technologies v. Hewlett Packard* (2:13-cv-0524, E.D. Tex.); *Carucel Investments, L.P. v. Novatel Wireless, Inc.* (16-cv-118-H, S.D. Cal.); *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC* (5:14-cv-5262, W.D. Ark.); *Fortinet, Inc. v. Sophos, Inc.* (13-cv-5831-EMC, N.D. Cal.); *HM Electronics, Inc. v. R.F. Tech., Inc.* (12-cv-2884-BAS, S.D. Cal.); *Plew v. Limited Brands, Inc.* (1:08-cv-3741, S.D.N.Y.).

**LEGAL STANDARDS**

**I.     Federal Rule of Evidence 702 and Daubert**

"In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 requires the district court to serve in a gatekeeping role and make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017) (quoting *Daubert,* 509 U.S. at 592-93). In short, "*Daubert* requires the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017).

Although the Seventh Circuit reviews "the district court's application of *Daubert* [] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015) (citation omitted). "[T]he proponent of the evidence must establish that the expert's testimony is reliable (and relevant) by a preponderance of the evidence." *United States v. Saunders,* 826 F.3d 363, 368 (7th Cir. 2016).

## II. Patent Infringement Damages

"When a patent is infringed, the patentee is entitled to 'damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.'" *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012) (quoting 35 U.S.C. § 284). Put differently, a "patent owner, having prevailed on liability, may receive a reasonable royalty or lost profits, but not both for the same infringing

6

units." *Asetek Danmark A/S v. CMI USA Inc.,* 852 F.3d 1352, 1362 (Fed. Cir. 2017). "A reasonable royalty may be calculated using one of two baselines," namely, "an established royalty" or "upon the supposed result of hypothetical negotiations between the plaintiff and defendant." *Versata Software, Inc. v. SAP Am., Inc.,* 717 F.3d 1255, 1267 (Fed. Cir. 2013) (citation and quotation marks omitted). The hypothetical negotiation "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326-27 (Fed. Cir. 2009).

In assessing the hypothetical negotiation inquiry, the Federal Circuit "has sanctioned the use of the *Georgia–Pacific* factors to frame the reasonable royalty inquiry." *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1317 (Fed. Cir. 2011) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.* 318 F. Supp. 1116 (S.D.N.Y. 1970)); *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) ("Factors relevant in a reasonable royalty determination using this method include those set out in *Georgia–Pacific*."). The *Georgia-Pacific* factors "are meant to provide a reasoned economic framework" for the hypothetical negotiation. *Whitserve,* 694 F.3d at 27. "The first step in a reasonable royalty calculation is to ascertain the date on which the hypothetical negotiation in advance of infringement would have occurred." *Integra Lifesciences I, Ltd. v. Merck KGaA,* 331 F.3d 860, 870 (Fed. Cir. 2003), *vacated on other grounds,* 545 U.S. 193 (2005). "In general, the date of the hypothetical negotiation is the date that the infringement began." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) (citing *Georgia-Pacific*, 318 F. Supp. at 1123); *see also Applied Med. Res. Corp. v. U.S. Surgical Corp.,* 435 F.3d 1356, 1363-64 (Fed. Cir. 2006) ("the hypothetical negotiation relates to the date of first infringement."). "The correct determination of this date is

7

essential for properly assessing damages" keeping in mind that the hypothetical negotiation framework is "an exercise in approximation[.]" *Integra Lifesciences I,* 331 F.3d at 870.

## ANALYSIS

Defendants move to exclude Dr. Kennedy's expert opinion testimony under *Daubert* and Federal Rule of Evidence 702 arguing that he did not calculate a hypothetical negotiation date in his analysis, but rather assumed that a hypothetical negotiation took place sometime in 2010, and that this assumed date invalidates Dr. Kennedy's entire reasonably royalty analysis. In other words, Defendants are not arguing that Dr. Kennedy failed to use the correct methodology, namely, the well-established reasonable royalty/hypothetical negotiation framework in assessing patent infringement damages. Instead, their argument goes to Dr. Kennedy's application of this method to the facts of this case. *See Krik,* 870 F.3d at 674. (Under *Daubert*, "a trial judge must make a preliminary assessment that the testimony's underlying reasoning or methodology is scientifically valid and properly applied to the facts at issue."). In addition, the parties do not appear to dispute the date of the hypothetical negotiation. Instead, Defendants challenge Dr. Kennedy's conclusion that his reasonable royalty damages would not change by moving the date from 2010 to October 2009.

A good starting point in understanding Dr. Kennedy's calculation of the hypothetical negotiation date is Defendants' damages expert's analysis. More specifically, Defendants' expert David Harkavy explained:

> The date of the hypothetical negotiation depends on the specific facts and circumstances of each case. My opinion is that the date of the hypothetical negotiation should be when a prudent licensee would seek to acquire rights to the patent-in-suit; oftentimes, that time is prior to the first date of the infringement. Based on PIL production information, PIL began selling the accused product in October 2009. It is my opinion that the hypothetical negotiation between Sonix and Defendants would have been just prior to October 2009.

8

(R. 274-4, Ex. D, Harkavy Rebuttal Rep., at 13.)[1] The "produced information" Mr. Harkavy relied upon was Bates stamped PIL-SDX121289, which was a report reflecting detailed sales records of the accused products. (*Id*. at 13 n.24.)

Dr. Kennedy also opined as to the hypothetical negotiation date in his expert report dated May 5, 2015, but did not rely on Bates stamped PIL-SDX121289 and other sales data Mr. Harkavy relied upon because Defendants had yet to produce these documents. Nevertheless, despite Defendants' arguments to the contrary, Dr. Kennedy separately assessed the hypothetical negotiation date for each Defendant. In relation to Defendants PIL and SD-X, for example, Dr. Kennedy opined:

> [P]IL's product of sales data for its interactive books at issue in this case does not contain specific date information. However, I understand that SD-X entered into a license and supply agreement with Generalplus Technology in March 2010. Additionally, various My Poingo books have publication dates of 2010. I have therefore assumed that the negotiation for rights to practice the '845 patent would occur just prior to the first sale of an infringing produce in 2010 and the parties to the negotiations would be Sonix as licensor and PIL as licensee.

(R. 274-1, Ex. A, Kennedy Report, at 24.) With respect to Defendant Herff-Jones (also referred to as its predecessor "Replogle"), Dr. Kennedy stated:

> I further assume that Sonix and Replogle would have entered into a licensing negotiation prior to selling the accused Intelliglobe. The date of the Replogle Agreement was February 1, 2010, and the first sale of the accused Intelliglobes reported in this litigation was August 2010. However, internet web archives show offers for sale in approximately March 2010. At this time I do not have sufficient information to determine the exact date of first infringement for either Replogle or PIL. I assume that the hypothetical negotiations would have

---

[1] Although the parties filed numerous documents under seal, the Seventh Circuit has held that "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht,* 622 F.3d 697, 701 (7th Cir. 2010); *see also United States v. Foster,* 564 F.3d 852, 853 (7th Cir. 2009) (sealed documents "that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.").

been roughly coincident in 2010, pending additional information clarifying the exact infringing sales dates.

(*Id.*) In reference to Defendant Encyclopedia Britannica, Dr. Kennedy explained:

> Encyclopedia Britannica earned a royalty from PIL for PIL's sales of Britannica's Science Library books and sets. I assume that sales of Britannica materials by PIL would be covered by the PIL-Sonix negotiation and no separate negotiation would be required between Sonix and Encyclopedia Britannica. I also understand that Encyclopedia Britannica purchased Science Library materials from PIL and resold these materials to third party customers. These sales would be accounted for in PIL's sales data, and I assume Sonix would have earned its royalties on PIL's sales; therefore I have not quantified Encyclopedia Britannica's sales separately.

(*Id.* at 24-25.)

Defendants issued Mr. Harkavy's expert rebuttal report on June 1, 2015, approximately a month after Dr. Kennedy's May 5, 2015 expert report. As mentioned, prior to Dr. Kennedy's May 2015 report, Defendants had not produced the sales report Bates stamped PIL-SDX121289 and other relevant sales information, to Sonix. The parties do not dispute that on June 24, 2015, Sonix requested production of PIL-SDX121289 and the other records that Mr. Harkavy referenced in his report, after which Defendants produced these documents. Once Defendants produced these documents, including PIL-SDX121289, Sonix provided Dr. Kennedy with the documentation before his deposition on June 30, 2015.

As discussed, prior to the production of PIL-SDX121289 and the other documents upon which Mr. Harkavy relied, Dr. Kennedy had determined the hypothetical negotiation date as March 2010 – or sometime in 2010 – for each Defendant based on the evidence available to him at that time. (R. 274-1, Ex. A, Kennedy Rep., at 24-25; R. 301, 6/30/15, Kennedy Dep., at 63.) At his deposition, Defendants' counsel asked Dr. Kennedy about his reasonable royalty calculations:

Q. Okay. And then also you stated that he referred to certain documents that you

10

hadn't seen. Now that you have seen those documents, are – does that new information change any of your opinions that you expect to give on behalf of Sonix, either at a hearing or trial of this matter?

A. No. I think I might take the daily sales information and do a more accurate interest calculation at the time of trial, so that I would change, because I had to do a mid period estimate on the information I had at the time. It changes the date of the hypothetical negotiation. I had 2010 because I didn't have a specific timing.

I tried to make an inference about when that would be, based upon the other information I have and that I cite in my report. I think it's – the first sale is, I want to say September 2009, October 2009, based on the information off – Mr. – Mr. Markavy had, but that difference in timing wouldn't have a material impact on any of my conclusions, if at all.

(R. 301, 6/30/15, Kennedy Dep., at 61-62.)

A few weeks later, Sonix took the deposition of Mr. Harkavy asking him about the difference between an October 2009 hypothetical negotiation date and Dr. Kennedy's hypothetical negotiation date:

Q. Okay. So I want to – I'm still trying to understand what would be the impact of moving the date of the hypothetical negotiation from the date you've proposed of October 2009 to the date Dr. Kennedy proposes – proposed in 2010. How would that – what effect does that have on the royalty calculation in this case?

A. It does not impact my affirmative royalty calculation in this case.

Q. Okay. What does it impact?

A. It impacts or helps formulate my opinion on rebuttal to Kennedy.

Q. Okay. So if you moved your hypothetical negotiation date to Dr. Kennedy's, would it change your outcome?

A. It would not change my affirmative royalty.

Q. Right. And that's what I'm asking. I'm asking your calculation of the reasonable royalty would not be affected if you did it as of 2010 instead of October 2009?

A. I don't believe it would change my opinion on my affirmative reasonable royalty calculation.

11

> Q. Okay. So the issue of date is significant in your view because it affects Dr. Kennedy's analysis?
>
> A. In my opinion, because Kennedy assumes 2009 profits only based on a full year of 2009, that's the assumption that he's making; and he's representing to us that he's only using 2009 because it is a full year of sales and profits before the infringement.
>
> Q. And if he adopted your date, you would not have a full year of sales before the October 2009 date, correct?
>
> A. Correct. There's obviously an inconsistency there. But his assumption I still have an issue with. It's because what we've talked about, that it's only one years' worth of profits. And he knows and all the parties would know at the hypothetical negotiation date that Sonix's profits declined, profits declined, and there's an impact on royalty damages.

(R. 301-1, 7/21/15, Harkavy Dep., at 56-58.) Earlier in his deposition, Mr. Harkavy explained that Dr. Kennedy's calculations have inconsistencies because he used Sonix's profits for the full year of 2009 even though the date of first infringement was October 2009. (*Id*. at 48-49).

Despite both experts stating that the difference between a October 2009 hypothetical negotiation date and a 2010 hypothetical negotiation date would not change their individual reasonable royalty calculations, in their reply brief, Defendants argue that Dr. Kennedy has failed to explain why the difference in timing between October 2009 and March 2010 – or 2010 in general – would not have a material impact on his conclusions. To support this argument, Defendants highlight Mr. Harkavy's testimony that the difference of a hypothetical negotiation date of October 2009 instead of March 2010 would change Dr. Kennedy's reasonable royalty calculations. Given the situation and because Defendants' late production of documents contributed to it, the Court will permit Sonix to supplement Dr. Kennedy's expert report explaining the basis for his conclusion that "regardless of which hypothetical negotiation date is used, his reasonable royalty analysis would remain the same." *IBM v. Priceline Grp. Inc.*, ____ F.Supp.3d ___, No. CV 15-137-LPS, 2017 WL 4174938, at *18 (D. Del. Sept. 18, 2017); *see,*

*e.g., Fairchild Semiconductor v. Power Integrations,* No. 12-540-LPS, 2015 WL 1303643, at * 2 (D. Del. March 20, 2015); *Cassidian Commc'ns, Inc. v. microDATA GIS, Inc.*, No. 2:12-CV-00162-JRG, 2013 WL 12148459, at *1-2 (E.D. Tex. Dec. 10, 2013).[2] Dr. Kennedy is not permitted to change his conclusion, but instead must explain why the analysis would remain the same. Also, because Dr. Kennedy testified about the 2010 hypothetical negotiation date and Mr. Harkavy testified in rebuttal, Defendants will not be prejudiced by Dr. Kennedy's supplemental report. Moreover, the Court will permit Mr. Harkavy to issue a supplemental rebuttal report on this limited issue.

Defendants further argue that Dr. Kennedy's methodology is legally flawed because he considered events after the date of first infringement when making his calculations. Defendants, however, do not highlight which "events" they are challenging. Nonetheless, as Judge Holderman explained in a similar situation where he denied a *Daubert* motion based on the expert using the "wrong" hypothetical negotiation date:

> [T]he key complaint [Defendants] make is that that [plaintiff's expert] used facts and events that occurred after the 2002 hypothetical negotiation date to verify her opinion. That also does not establish unreliability of her expert opinion as a matter of law. An argument could be made that [by] using post–2002 facts to check the veracity of her opinion about hypothetical negotiations in 2002 actually enhances her opinion's reliability, while [Defendants' expert] not checking his 2002 hypothetical estimates against subsequent reality detracts from the credibility of his opinion. At its best, this area of both experts' opinions is fodder for examination at trial before the jury, not grounds for pretrial exclusion in this case.

*Costar Realty Info., Inc. v. CIVIX-DDI, LLC,* No. 12 C 4968, 2014 WL 4922230, at *1 (N.D. Ill. Sept. 30, 2014). Indeed, "the hypothetical negotiation analysis 'permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to

---

[2] In his expert report, Dr. Kennedy states "[t]o the extent that additional evidence is produced in this case, I reserve the right to prepare a supplemental report incorporating this new information[.] (Kennedy Rep., at 1.)

or predicted by the hypothesized negotiators'" under what is known as the "book of wisdom" rubric. *Lucent Techs.*, 580 F.3d at 1333 (quoting *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988)); *see, e.g., Aqua Shield v. Inter Pool Cover Team,* 774 F.3d 766, 772 (Fed. Cir. 2014). As Mr. Harkavy testified at his deposition in respect to Sonix's profits declining after 2009, "[t]he book of wisdom allows a damages expert to consider facts that take place after the hypothetical negotiation even right up to the day of trial." (Harkavy Dep., at 49-50.) In any event, without a more detailed explanation why the alleged post-infringement analysis is erroneous, Defendants' argument is waived. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.,* 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). The Court therefore denies this aspect of Defendants' *Daubert* motion.

## CONCLUSION

For these reasons, the Court, in its discretion, grants in part without prejudice and denies Defendants' motion to bar the testimony of Plaintiff's expert damages witness.

**DATED:** November 8, 2017

                **ENTERED**

                */s/ Amy J. St. Eve*
                **AMY J. ST. EVE**
                **United States District Judge**